**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, AIRLINE DIVISION & Teamsters Local 19, Plaintiffs-Appellees,**

v.

**SOUTHWEST AIRLINES CO., Defendant-Appellant.**

No. 87–1085.

United States Court of Appeals, Fifth Circuit.

April 21, 1988.

J. Joe Harris, San Antonio, Tex., for defendant-appellant.

James L. Hicks, Jr., Hal K. Gillespie, Dallas, Tex., and Wilma B. Liebman, Washington, D.C., for plaintiffs-appellees.

Before GOLDBERG, JOHNSON and WILLIAMS, Circuit Judges.

IRVING L. GOLDBERG, Circuit Judge:

Southwest Airlines appeals from the District Court's conclusion that this controversy between Southwest and its mechanics over implementation of a program of mandatory testing for drug and alcohol use constitutes a "major" dispute as defined by the Railway Labor Act. We therefore review the District Court's legal conclusions that the program involves a mandatory subject of bargaining and that the program is not "arguably justified" by the collective bargaining agreement, as well as the District Court's factual findings supporting those conclusions. Finding no error, we affirm the District Court's grant of a preliminary injunction.

## I. Facts

Appellant, Southwest Airlines Co. ("Southwest"), is a common carrier by air engaged in interstate commerce subject to the Railway Labor Act. 45 U.S.C. §§ 151–188 (the "RLA"). In 1982, Appellee, the International Brotherhood of Teamsters (the "Teamsters"), succeeded the International Association of Machinists as representative of Southwest's mechanics and related employees.

■ Until August of 1987, Southwest and the Teamsters were parties to a collective bargaining agreement.[1] The collective bargaining agreement contained a management rights clause which provided:

> Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement, and which have been made available to the employee prior to becoming effective.

(R. Vol. I, p. 83). The collective bargaining agreement contains no rules against drug and alcohol abuse.

Southwest has, however, maintained a

---

1. At oral argument counsel advised the panel that, though the contract is open, Southwest remains steadfast in its position that it has the right to unilaterally impose the drug testing program and refuses to bargain. This case is not moot. Even with the contract open for bargaining, we must at least reach the question of whether the proposed program constitutes a mandatory subject of bargaining. Even if management conceded that mandatory drug testing is a mandatory subject of bargaining, the dispute would continue, as capable of repetition but evasive of review. *Compare Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *with Defunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). Were we simply to reach whether this is a mandatory subject, it is entirely conceivable that the parties would bargain to impasse, appeal and reach this court only after the contract was again open for bargaining. *Burlington N. R.R. v. Bhd. of Maintenance of Way Employees,* — U.S. —, 107 S.Ct. 1841, 1846 n. 4, 95 L.Ed.2d 381 (1987). *See Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per curiam* ); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). We therefore reach the question of whether this dispute is "major" or "minor" under the RLA.

unilaterally imposed work rule, Rule G,[2] which provides:

G. *Serious Unacceptable Conduct.*

Violation of any of the following is considered a serious offense and may result in immediate discharge.

....

4. Reporting for or carrying on work while *showing* any *signs* of the use of intoxicants or knowingly permitting another employee to do so is strictly prohibited.

5. *Possession* of or *drinking* of any intoxicant or illegal *possession* or *use* of illegal or dangerous drugs *on company premises* or while in uniform and/or habitual use of intoxicants or use of illegal or dangerous drugs on or off duty will not be tolerated.

(R. Vol. I, p. 141) (emphasis added).

The District Court found that before October, 1986, Southwest had no existing practice for detecting violations of rules G(4) and G(5) other than visual observation. (R. Vol. III, p. 115). The District Court also found that there was no history of problems with drug or alcohol abuse[3] and no history of Rule G enforcement. Southwest presented evidence of only one instance where an employee was observed to be drunk while on duty. Southwest offered the employee an opportunity to take a urine test. He refused. He was neither forced to take the test nor disciplined for his refusal, based upon Southwest's belief that it could not require testing.[4]

On October 16, 1986, Southwest advised the Teamsters of its desire to unilaterally implement a drug and alcohol testing program (the "Program"). Southwest invited representatives of the Teamsters to a meeting on November 6, 1986 for the purpose of reviewing the Program, saying, "because we have added to our current regulations, we wanted you to have this information prior to its distribution." (R. Vol. I, p. 180). The Teamsters immediately sought to bargain over the terms of the Program. Southwest expressed a willingness to discuss the content of the proposed Program, but refused the Teamsters' request to bargain. (R.Vol. I, p. 181–184; R.Vol. I, p. 137). Unions representing other Southwest employees engaged in discussions with Southwest which altered the shape of the Program.

The Program consists of: 1) a general work rule or policy, which prohibits detectable levels of illegal drugs, defines alcohol intoxication as a blood alcohol level of .05%, and prohibits use of over-the-counter and prescription drugs which might impair performance;[5] 2) mandatory pre-employment urine drug screens, and mandatory urine drug screens of employees under certain defined circumstances;[6] 3) detailed testing

2. Some form of Rule G has been in force throughout the Railroad and Airline industries for at least 40 years. *Brotherhood of Locomotive Engineers v. Burlington N. R.R.,* 838 F.2d 1102, 1107 (9th Cir.1988).

3. Southwest's counsel conceded this point at oral argument.

4. (R.Vol. III, p. 62–67, 70–74, 117–118). One other employee who had a problem with accidents and absenteeism was offered the opportunity to enter an alcohol treatment program. He refused. He was ultimately fired, but for the absenteeism and accident problem, not because of any problem with alcohol, or because of any refusal to take a test.

5. The new policy provides:
Southwest Airlines prohibits Company employees from reporting for work and/or from working with:
• detectable levels of illegal drugs in their systems.

• alcohol levels which could impair their ability to perform their duties and thus adversely affect the safety of the airline and/or the work being performed, and in no event, a level in excess of .05%. Should regulations or law require a stricter level for any particular work group, those levels would supercede the .05% level.

• prescription drugs and over-the-counter medication which could, in the opinion of ... Company appointed doctors, have adverse effects on the safety of the airline and/or the work being performed. Should there be a question regarding prescription drugs and over-the-counter medications being taken by employees who are required to have physicals for license purposes, the Company appointed doctor(s) will consult with the doctor issuing the medical certificate.

6. The Program requires testing as follows:
*Drug/Alcohol Testing for Current Southwest Employees*

rules including employee releases, confidentiality and chain-of-custody safeguards, use of a confirmatory test in the event of a positive initial result, and provisions for a second test at an employee's request;[7] and 4) establishment of punishments and procedures to be followed in the event of violation of the policy.[8]

On January 1, 1987, Southwest implemented the Program. The Teamsters objected and sought a preliminary injunction. The District Court enjoined the Program, concluding that its implementation constitutes a "major" dispute under the RLA. The District Court supported this conclusion by finding that the Program constitutes a comprehensive means of monitoring, testing and punishing violations of rules prohibiting drug and alcohol use or possession, and that as such it is not arguably justified by Rule G or past practice of enforcing Rule G. The District Court further concluded that each element of the Program constitutes a "major" change warranting an injunction. Alternatively, the District Court concluded that even if the disputes were deemed "minor" there exists a substantial likelihood of irreparable harm warranting an injunction to preserve the status quo pending arbitration of the dispute under the terms of the labor contract.[9]

## II. Discussion

In deciding this case we are cognizant of Oliver Wendell Holmes dictum "Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law

---

A. Employees of Southwest Airlines *will* be sent for urine drug screens and/or blood alcohol tests under the following circumstances:
1) After each vehicular equipment and/or aircraft damage accident *unless* management waives the test due to their investigative conclusion that alcohol or drugs could not in any way have been contributory to the incident.
2) After each on-duty accident (other than vehicles or aircraft) and/or on-the-job injury in which there is reasonable suspicion* to believe that an employee has violated Southwest's drug/alcohol policy.
3) Whenever management has reasonable suspicion* to believe that the policy has been violated.
4) Whenever a previously non-physicalled employee successfully interviews for a position within the company which requires a physical examination.
*"Reasonable suspicion" shall include, but not be limited to, management's personal observation of an employee's appearance, behavior, or speech.

7. Tests are to be performed according to defined procedures:
Laboratories will be approved and designated for testing and procedures will be established for uniformity and accuracy, including chain-of-custody safeguards. The importance of confidentiality will be stressed in all situations and will be considered to be an aspect given utmost consideration. The name of the employee being tested, as well as results of the test will be restricted to the Vice President of the respective department and the Review Board. All positive results of a preliminary screen will be automatically tested by the laboratory using the GC Mass Spectrometry method *before* sending the report to the Company and samples will then be kept for a two week period following the collection. Should this test be positive, the employee may request a re-test and shall bear the expense of this test; Southwest will pay for re-tests which yield negative results. (approximate cost of retest: $75.00.)

8. The Program prescribes the following punishments:
A. Violation of any portion of Southwest's Drug and Alcohol Policy by employees shall subject them to disciplinary action, up to and including discharge....
B. In cases which arise from testing under Section IV, Part A–4 where there have been no visible signs of drug and/or alcohol use or abuse but where the employee tests positive for illegal drugs when going through the Company required physical, said employee will be given 5 days from the time of notification of the test results to seek assistance through Southwest's EAP. If contact has not been made within this time period, the employee will be terminated....

9. Because we today determine that this dispute is major, we need not determine whether the district court abused its discretion in issuing an injunction to preserve the status quo based on the possibility of irreparable harm. Still, we note that the common law places a high value on individual privacy. Unreasonable invasions of privacy are considered tortious, *see* Brandeis and Warren, *The Right To Privacy*, 4 Harv.L. Rev. 193 (1890), and the harm done is not easy to quantify. Because we do not reach the question we need not determine whether the likelihood of a finding that the invasion of privacy will be found unreasonable merits granting of a preliminary injunction.

of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment." *Northern Securities v. United States,* 193 U.S. 197, 400, 24 S.Ct. 436, 486, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

Drug testing in the public and private sectors is an issue of great social importance and controversy. Over 25% of the Fortune 500 companies now require drug tests of all successful job applicants.[10] The Federal government has enacted regulations requiring drug tests of customs inspectors, and has proposed regulations requiring testing of railroad employees. Courts have reached different conclusions regarding whether such drug testing constitutes a reasonable search under the Fourth Amendment. *Compare National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) (approving plan for testing of customs officials), *with Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.1988) (invalidating Department of Transportation regulations requiring testing of railroad workers). The Supreme Court has granted certiorari in *Von Raab* to deal with the fourth amendment issue.

In this climate it is perhaps useful to spell out first what this case does not involve. It does not deal with the legality of private employers requiring a drug test as a condition of employment. It does not deal with the constitutionality of government mandated drug testing. It does not deal with the propriety of allowing employees to use drugs. It deals only with the rights of a collective bargaining representative to participate in the formulation of a mandatory drug testing program, to negotiate over the shape that program will take. Though this case involves issues of national importance, it can and must be resolved by reference to established principles under the RLA as enacted by Congress and interpreted by the courts. The determinative factors are not whether drugs are dangerous, or whether drug testing is intrusive, but whether the program of mandatory testing and punishment chosen by Southwest is consistent with the collective bargaining agreement between Southwest and the Teamsters.

## A. Mandatory Subject of Bargaining?

▮ The first inquiry in this case is whether the Program is a mandatory subject of bargaining under the Railway Labor Act. This is a question of law, which we review *de novo. Japan Airlines Co. v. International Association of Machinists,* 538 F.2d 46, 52–53 (2d Cir.1976). Unless a dispute involves a mandatory subject, management may act unilaterally without discussing the change with the collective bargaining representative. *Order of Railroad Telegraphers v. Chicago & Nw. Ry.,* 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) (subcontracting out of work that would deprive existing employees of their jobs constitutes a mandatory subject); *see Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

The Railway Labor Act imposes a duty upon employers and labor unions to bargain in good faith over "rates of pay, rules and working conditions." [11] But "The collective bargaining process is neither a short nor an easy one and the delicate balance upon which ultimate agreement frequently

---

10. National Institute on Drug Abuse, *Alcohol and Drugs in the Workplace* 29 (1985) (BNA Special Report); *see* Aron, *Drug Testing: The Employer's Dilemma,* 38 Labor L.J. 157 (1987); Wood, *Employee Drug Testing: Practical and Legal Considerations,* 66 Mich.B.J. 158 (1987); Rust, *Drug Testing: The Legal Dilemma,* 72 A.B. A.J. 50 (1986).

11. 45 U.S.C. § 152, First, provides:

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

rests would be needlessly jeopardized were the parties at liberty to insist upon the discussion of subsidiary matters.... Inevitably, the chance of deadlock increases as the perimeter of negotiations expands." *Japan Air Lines,* 538 F.2d at 52. For this reason, the First, Second and Ninth Circuits have held that the duty to bargain imposed by the RLA extends only to those proposals directly related to "rates of pay, rules and working conditions." *Id.; International Association of Machinists v. Northeast Airlines,* 473 F.2d 549, 556–57 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972); *Brotherhood of Locomotive Engineers v. Burlington N. R.R.,* 838 F.2d 1087, 1090–91 (9th Cir.1988). One of these issues must be implicated, and the action by management must affect people presently in the bargaining unit. *Japan Airlines,* 538 F.2d at 53.[12]

Applying this standard, the Ninth Circuit has determined that both mandatory drug testing and random use of "sniffer dogs" to detect drugs are mandatory subjects of bargaining. *Brotherhood of Locomotive Engineers v. Burlington N. R.R.,* 838 F.2d 1102 (9th Cir.1988); *Brotherhood of Loco-*

*motive Engineers v. Burlington N. R.R.,* 838 F.2d 1087 (9th Cir.1988).

No case in this Circuit has dealt with this issue under the RLA. We are guided, however, by cases decided under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (the "NLRA"). This Circuit has held that the term "condition of employment,"[13] as used in § 8(d) of the NLRA, includes safety rules. *NLRB v. Gulf Power Company,* 384 F.2d 822 (5th Cir.1967). The Supreme Court has held that under the NLRA mandatory subjects are those which are "germane to the 'working environment,' " and "not among those 'managerial decisions [ ] which lie at the core of entrepreneurial control.' " *Ford Motor Co. v. NLRB,* 441 U.S. 488, 498, 99 S.Ct. 1842, 1850, 60 L.Ed.2d 420 (1979) (quoting *Fibreboard,* 379 U.S. at 222–23, 85 S.Ct. at 409–10).

■ Southwest conceded at oral argument that instituting the Program constitutes a change in working conditions and this is correct.[14] We have no doubt that instituting a drug testing program is directly related to the working conditions of

**12.** *See* NLRB General Counsel's Memorandum on Drug and Alcohol Testing, Memorandum GC 87–5 (September 8, 1987) *reprinted in* Daily Labor Report No. 184, pg. D–1 (September 24, 1987) [hereinafter cited as Collyer, *NLRB General Counsel's Memorandum on Drug and Alcohol Testing* ].

**13.** The term "conditions of employment" is "susceptible of diverse interpretations," *Fibreboard,* 379 U.S. at 221, 85 S.Ct. at 408 (Stewart J., concurring). It can be read as relating to the physical conditions under which employees labor or as relating to prerequisites to employment.

**14.** Ms. Rosemary Collyer, General Counsel to the NLRB has stated unequivocally that mandatory drug testing constitutes a "substantial change in working conditions" even where there is an existing program of mandatory physicals.

In cases where an employer has an existing program of mandatory physical examinations for employees or applicants, an issue arises as to whether the addition of drug testing constitutes a substantial change in the employees' terms and conditions of employment. In general, we conclude that it does constitute such a change. When conjoined with discipline, up to and including discharge, for refusing to

submit to the test or for testing positive, the addition of a drug test substantially changes the nature and fundamental purpose of the existing physical examination. Generally, a physical examination is designed to test physical fitness to perform the work. A drug test is designed to determine whether an employee or applicant uses drugs, irrespective of whether such usage interferes with ability to perform work. In addition, it is our view that a drug test is not simply a work rule—rather, it is a means of policing and enforcing compliance with a rule. There is a critical distinction between a rule against drug usage and the methodology used to determine whether the rule is being broken. Moreover, a drug test is intrinsically different from other means of enforcing legitimate work rules in the degree to which it may be found to intrude into the privacy of the employee being tested or raise questions of test procedures, confidentiality, laboratory integrity, etc. The implementation of such a test, therefore, is a "material, substantial, and ... significant change in [an employer's] rules and practices ... which vitally affect[s] employee tenure and conditions of employment generally."

Collyer, *NLRB General Counsel's Memorandum on Drug and Alcohol Testing* (cited in note 12).

employees presently within the bargaining unit.

■ Though the Program decidedly involves a mandatory subject of bargaining, Southwest contends that the Teamsters have waived their right to bargain over work rules by accepting a management rights clause. A party may, of course, contractually waive its right to bargain about a particular mandatory subject. *NLRB v. American National Insurance Co.*, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). But waiver by contract must be "clear and unmistakeable," and cannot be lightly inferred. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *see* Morris, 1 *The Developing Labor Law* 640–50 (2d ed. 1983). We may find waiver by contract where the language of the agreement is specific, or the history of prior contract negotiations suggests that the parties discussed the subject and the union "consciously yielded." *NL Industries, Inc.*, 220 N.L.R.B. 41, 43–44 (1975), *enf'd* 536 F.2d 786 (8th Cir.1976). Where management rights clauses are invoked the clause must provide specific justification for the unilateral action taken. *See Ador Corp.*, 150 N.L.R.B. 1658 (1965).

The management rights clause in the collective bargaining agreement between Southwest and the Teamsters provides simply that employees shall abide by all rules presently in effect and later enacted. The clause says nothing about the process for enacting new rules. The Teamsters have merely agreed to abide by all rules which are validly enacted.[15] The language does not facially imply a waiver by the Teamsters of the right to bargain over work rules which involve mandatory subjects, and falls far short of the clear statement required to constitute "clear and unmistakeable waiver." Far from waiving their right to bargain, the Teamsters have consistently insisted on their right to negotiate over implementation of the Program.

## B. Is This Dispute Major or Minor?

Having determined that the proposed Program involves a mandatory subject of bargaining, the jurisprudence that has arisen under the Railway Labor Act requires us further to determine whether this dispute over implementation of the Program constitutes a "major" or a "minor" dispute.

In *Brotherhood of Locomotive Firemen v. Southern Pacific R.R.*, 447 F.2d 1127, 1131–32 (5th Cir.1971), we explained the workings of the Railway Labor Act. The basic purpose of the RLA is "[t]o avoid any interruption of commerce or the operation of any carrier engaged therein." 45 U.S.C. § 151a. To this end the RLA has created a complex but effective set of mechanisms for resolving disputes. The RLA begins, in Section 2, First, of the Act, by imposing a general duty on both parties "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions." 45 U.S.C. § 152, First. Section 2, Second, of the Act requires parties to all disputes to make attempts to resolve the dispute voluntarily. 45 U.S.C. § 152, Second.

■ Should voluntary attempts to resolve the dispute fail, the RLA provides two sets of procedures following two distinct strategies for dealing with the two basic types of dispute. Although the Act did not expressly label these two categories of controversies, they are commonly referred to as "major" disputes and "minor"

---

15. Ms. Collyer dismissed this type of waiver argument saying:

We have concluded that in the absence of clear bargaining history to the contrary, broad management rights clauses giving an employer the right "to issue, enforce, and change Company rules", or to "make and apply rules and regulations for production, discipline, efficiency and safety" or requiring employees to observe the employer's existing rules and regulations, do not, standing alone, constitute a waiver of the union's right to bargain over drug testing. Such clauses refer only to employer rules and regulations generally and do not refer clearly and specifically to drug testing. And, as previously observed, drug testing is not a "rule or regulation" but, rather, is a unique and distinctive means of enforcing rules regarding drug use.

Collyer, *NLRB General Counsel's Memorandum on Drug and Alcohol Testing* (cited in note 12).

disputes. *See Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). "Major" disputes are those disputes arising from proposed changes in a collective bargaining agreement.[16] "Minor" disputes involve grievances arising over the interpretation or application of existing collective bargaining agreements.[17] The RLA treats these two types of disputes very differently. "Major" disputes are dealt with through mediation in the context of a judicially enforced status quo. "Minor" disputes, or grievances, are dealt with through binding arbitration.

■ If the controversy is "major," that is, a dispute arising out of proposals for a new contract or for changes in existing agreements, the parties first go to mediation, § 5, First, 45 U.S.C. § 155, First; if that fails, to acceptance or rejection of arbitration, *id.;* and finally to possible Presidential intervention. § 10, 45 U.S.C. § 160. While the Act's bargaining procedures are being exhausted, the union is prevented from striking and the carrier is prohibited from doing anything that would justify a strike.[18] Once these procedures are exhausted, however, compulsory processes are at an end, and either party may resort to self help or unilateral action. *Burlington N. R.R.,* 107 S.Ct. at 1851; *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969). No authority is empowered to de-

16. In *Burley,* the Court described "major" disputes as those which arise:

> over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to the assertion of rights to have vested in the past.... [they are] the larger issues about which strikes ordinarily arise with consequent interruptions of traffic the Act sought to avoid.

325 U.S. at 723–24, 65 S.Ct. at 1289–90.

17. A "minor" dispute:

> contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring a formal change in terms or to create a new one. The dispute related either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future.

*Id.* at 723, 65 S.Ct. at 1290.

18. *Burlington N. R.R. v. Brotherhood of Maintenance of Way Employees,* — U.S. ——, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987); *Detroit & T. Shore Line R.R. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). The Act establishes three provisions which preserve the status quo in major disputes. Each covers a different stage of the dispute settlement process. As described by the Supreme Court:

> Section 6, the section of immediate concern in this case provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in the agreements up to and through any proceedings before the National Mediation Board. Section 5, First, provides that for 30 days following the closing of Mediation Board proceedings "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose," these provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2, First, "to exert every reasonable effort" to settle disputes without interruption to interstate commerce.
>
> While the quoted language of §§ 5, 6, and 10 is not identical in each case, we believe that these provisions, together with § 2, First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day "cooling-off" period. Although these three provisions are applicable to different stages of the Act's procedures, the intent and effect of each is identical so far as defining and preserving the status quo is concerned. The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

396 U.S. at 150–53, 90 S.Ct. at 299–300.

cide the dispute unless the parties jointly agree to arbitration.

If the dispute is "minor," that is, a controversy arising over the interpretation or application of an existing collective agreement, either party, upon impasse, may submit the grievance to final and binding arbitration before the National Railroad Adjustment Board or a system board of adjustment established by the parties. 45 U.S.C. § 153, First (m), Second. While resort to self-help, such as strikes is precluded in minor disputes, *Brotherhood of Railroad Trainmen v. Chicago R. & I. R.R.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *cf. Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), there is no general provision in the Act prohibiting a party from acting unilaterally upon its interpretation of the contract pending exhaustion of the grievance procedures. *International Association of Machinists v. Frontier Airlines, Inc.*, 664 F.2d 538 (5th Cir.1981); *Switchmen's Union v. Central of Georgia Ry.*, 341 F.2d 213 (5th Cir.), *cert. denied*, 382 U.S. 841, 86 S.Ct. 41, 15 L.Ed.2d 82 (1965).

■ Though the distinction between "major" and "minor" disputes rests on a legislative judgment that issues of contract formation tend to be more divisive than issues of contract interpretation, the method for determining whether a dispute is major or minor has absolutely nothing to do with how important a dispute is. The sole question is whether the proposed change has a basis in the contract. When a dispute can be resolved through an interpretive act, by reference to the contract or practice, the dispute may be resolved by an arbitrator. When the contract provides no guidance, no individual is empowered to resolve the dispute.

■ We must therefore determine whether this dispute involves contract interpretation or contract alteration. This legal conclusion rests heavily on the facts of the specific case. The cases in this Circuit demonstrate that "the difference on the one hand between the interpretation and application of an existing agreement, and, on the other hand, a change in an original intended basis of agreement is often a question of degree." *Brotherhood of Locomotive Firemen*, 447 F.2d at 1134 (quoting, *Rutland Ry. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21, 33 (2d Cir.1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963)). These attempts to distinguish between interpretation and modification present a wavering line which places a relatively light burden on the party proposing the change. An employer is not a modern day Prometheus bound by contractual chains of his own making. A dispute is minor, so long as the proposed change is "arguably justified" by the existing collective bargaining agreement. *Railway Express Agency Inc. v. Brotherhood of Ry. Airline & S.S. Clerks*, 437 F.2d 388, 392 (5th Cir.), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971). In *St. Louis, S.F. & T. Ry. v. Railroad Yardmasters of America*, 328 F.2d 749 (5th Cir.), *cert. denied*, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748 (1964), for example, Judge Tuttle concluded that the permissibility of elimination of yardmaster positions could be determined by reference to the contract. He said, "[W]e are at a loss to understand how it could be decided that the rights of the Union can be determined without a construction of the employment contract or agreement.... This is to be done by the appropriate tribunal.... It is *not a fictitious or merely colorable issue.* Before a tribunal can decide that the terminations at issue were not justified, it must construe the language of Rule 16(e)." *Id.* at 753 (emphasis added); *see also Brotherhood of Locomotive Firemen*, 447 F.2d at 1127 (dispute between railroad, engineer's union and fireman's union over method for calculating hours could be resolved by construing the agreement between the firemen and the railroad and was therefore not a "clear change" but a question of interpretation); *Railway Express Agency Inc. v. Brotherhood of Ry. Airline & S.S. Clerks*, 437 F.2d at 392 (where there was "an undisputed history of ... unilateral transfers of work with no apparent objection from the union ... REA [had] at least the arguable right to make

[such] transfers."); *St. Louis S.W. Ry. v. United Transportation Union,* 646 F.2d 230 (5th Cir.1981) (union's proposed modifications in group disability insurance benefits and caboose design specifications deemed "major," but possibly dispositive "minor" question of whether the Union's proposal was barred by a moratorium provision in a national agreement between the parties that forbids certain types of union proposals was to be decided first).

In determining whether a proposal is "arguably justified" by the contract we must look both to the contract itself and to the practices under the contract. "When long-standing practice ripens into an established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were a part of the collective-bargaining agreement itself. Such practices have been described as the 'actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose.'" *Brotherhood of Maintenance of Way Employees v. Burlington N. R.R.,* 802 F.2d 1016, 1022 (8th Cir.1986) (quoting *Detroit & T. Short Line R.R. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)). Thus we are faced with the question of whether the proposed Program is arguably justified by the contract as embodied in the express terms of the collective bargaining agreement, and as amplified by actual objective working conditions and practices.

Southwest argues that the Program is "arguably justified" either by the management rights clause discussed above, or by Rule G, which prohibits alcohol or drug use or possession during work time or on the airline premises. Applying this standard, the District Court found that the Program as a whole as well as its individual components constitute major disputes.[19] The District Court applied the proper legal standard. We may reverse its factual findings only if they are clearly erroneous.

1. Is the Program Arguably Justified by The Management Rights Clause of The Collective Bargaining Agreement?

■ In addition to arguing that the management rights clause of the contract constitutes a waiver of the right to bargain over work rules, Southwest argues that the management rights provision provides arguable justification for unilateral imposition of the Program. The District Court rejected this argument on the basis of the lower court opinions in two cases recently affirmed on this point by the Ninth Circuit. *Brotherhood of Locomotive Engineers v. Burlington N. R.R.,* 620 F.Supp. 163 (D.C. Mont.1985), *aff'd,* 838 F.2d at 1105; *Brotherhood of Locomotive Engineers v. Burlington N. R.R.,* 620 F.Supp. 173 (D.C. Mont.1985), *reversed,* 838 F.2d at 1090. Southwest argues that this case differs from the *Burlington* cases because the collective bargaining agreement contains a specific clause which they interpret as a waiver by the Teamsters of their right to bargain over changes in work rules. Because the standard for determining whether a dispute is "major" or "minor" turns on whether the interpretation is "arguably justified" by the contractual term, it is not our place or that of the district court to construe the contract if there is any doubt as to its meaning. But as we noted above, the management rights clause in this contract does not speak at all to the right to bargain over rules, only to a willingness to abide by rules validly enacted. Given the principles for construing management rights clauses discussed above, the question is not a close one. The District Court did not err in concluding that the management rights clause does not even arguably justify the Program.

---

**19.** Southwest argues further that the District Court erred by failing to apply the proper legal standard to the collective bargaining agreement. Errors of law are reviewed de novo. Southwest's allegation, however, is without merit. Judge Buchmeyer expressly stated that he would find the dispute to be major only if "a proposed practice by a carrier is a clear departure from the collective bargaining agreement," (R. Vol. III, p. 109) and conceded that "if the practice is arguably justified by the collective bargaining agreement, including ... past practices under the agreement, then a dispute is ... a minor one." *Id.*

### 2. Does Rule G Provide Arguable Justification for Mandatory Drug Testing?

With the exception of the management rights clause, the collective bargaining agreement contains nothing which relates to, let alone justifies, the unilateral imposition of mandatory drug testing. As mentioned above, however, a work rule, Rule G, prohibits intoxication, possession or use of alcohol or illegal drugs on company premises. Rule G, has been in effect throughout the duration of the collective bargaining agreement, and must be considered part of the contract. It is therefore necessary to determine whether either Rule G standing alone, or Southwest's history of enforcing Rule G provides a contractual basis for imposition of the Program.

No case in this Circuit has dealt with this question, but three cases have been decided in other circuits. All of them involve the Burlington Northern Railroad. *Brotherhood of Maintenance of Way Employees v. Burlington N. R.R.*, 802 F.2d 1016 (8th Cir.1986) (*Burlington I*); *Brotherhood of Locomotive Engineers v. Burlington N. R.R.*, 838 F.2d 1087 (9th Cir.1988) (*Burlington II*); *Brotherhood of Locomotive Engineers v. Burlington N. R.R.*, 838 F.2d 1102 (9th Cir.1988) (*Burlington III*). For convenience we will refer to them as *Burlington I, Burlington II*, and *Burlington III.* [20] While not dispositive, these cases provide examples of different forms of Rule G enforcement coupled with different types of drug testing programs. We examine the legal conclusion of the District Court in light of these decisions, comparing their factual context and contractual language with this case. In so doing we reiterate that the legal conclusion whether a practice is "arguably justified" is one of degree, and that we may reverse the factual findings which form the basis of this conclusion only if they are clearly erroneous. We must look at the aspects of the drug testing program in the particular case as well as the history of enforcement under that collective bargaining agreement. With all of this in mind, we conclude that of the four cases, this is the strongest case for a conclusion that the dispute is "major."

■ *a. Union acquiesence in voluntary urinalysis arguably justifies mandatory testing on particularized suspicion.* *Burlington I* was the first case at the Circuit level to deal with mandatory drug and alcohol testing. The Eighth Circuit found that "the parties [had] acquiesced in certain detection and investigation methods over the years, and these practices [could] fairly be considered to have become the status quo," 802 F.2d at 1022. Initially the primary method for Rule G enforcement was visual observation followed by further non-intrusive investigation by the supervisor. "The supervisor would rely on how the employee walked, talked, or smelled as well as on other physical manifestations of impairment." *Id.* at 1018. Later, however, the company began to use a breathalyzer, blood-alcohol tests, and urinalysis, but only as a means for the employee to clear himself of an accusation of a Rule G violation. The Union did not object to using drug testing in this manner. The District Court consequently found that there was a history of union acquiescence in Rule G enforcement through use of drug testing. Still,

**20.** A fourth case, *Railway Labor Executives v. Norfolk & W. Ry.*, 833 F.2d 700 (7th Cir.1987), is of no relevance to this case. There a railroad sought to include a mandatory drug screening test as part of the routine urinalysis taken during all company physicals. The district court found that Rule G had no bearing whatsoever on the justification for the test, but instead that the test was arguably justified by the uniform past practice of urinalysis during all company physicals. *See also Burlington I,* 802 F.2d at 1024. Southwest does not argue that any past practice of urinalysis during physicals justifies the practice of mandatory testing as required under the Program.

*Burlington II* relied on another decision decided by the Ninth Circuit on the same day, *Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.1988), to dispose of Burlington's argument that the right to impose mandatory drug testing was an implied in law term of the contract as a result of the Department Of Transportation's Drug and Alcohol regulations. *Burnley* invalidated those regulations. Today we say nothing about the validity of federally mandated drug testing, or its effect on the contract. It is not at issue in this case.

there was a limit to that acquiesence. "The union's acquiescence in [Burlington's] past methods of enforcement was hardly intended to authorize a dragnet." *Id.* at 1023. The District Court in *Burlington I* found that a past practice had developed of acting to enforce Rule G where visual observation created particularized suspicion and further investigation confirmed that suspicion.

Cognizant of this past practice, the Eighth Circuit looked to the proposed program. The program consisted of post incident testing on the basis of particularized suspicion. Testing was used only following human factor accidents, and only when individual responsibility was not clear. Moreover, Burlington assured the Court that they would not test a whole crew when suspicion could be focused on particular individuals who were in a position to have caused the accident. Given the past history of investigation after ascertaining particularized suspicion, the urine test was seen simply as "a more refined step . . . to confirm the observation of the supervisor." *Id.* at 1023. The District Court concluded and the Eighth Circuit agreed that "Since the test can be required only upon some showing that the employee may be impaired, the ground rules between the union and the railroad have not changed significantly; suspicion of impairment is still required." *Id.* The Eighth Circuit expressly stated that it took no position over whether a broader testing policy would be permitted.[21]

■ *b. Past practice of Rule G enforcement by visual observation without acquiesence in voluntary drug testing does not arguably justify mandatory testing based on generalized suspicion.* In *Burlington II,* Burlington Northern introduced a program requiring all crew members involved in human factor accidents or operating rule violations to submit to urinalysis for the presence of narcotics, unless responsibility for the accident or violation otherwise had been clearly identified. Any employee refusing to submit to a test was subject to discipline for insubordination. Again the District Court looked to the past practice used for enforcing Rule G and found that the only practice in place was sensory observation. The District Court found this program to be a minor dispute, justified by the past practice of sensory observation. The Ninth Circuit reversed, finding that the change from testing on particularized suspicion to testing on generalized suspicion constituted a major dispute as a matter of law.

There is some tension between this case and *Burlington I.* Indeed, Judge Alarcon argued in dissent that the two cases create a split in Circuits. They can, however, be reconciled. *Burlington II* lacks the past history of union acquiescence in voluntary drug testing, as well as the self imposed limitations of post incident testing to individuals who could have been responsible for the accident. The Eighth Circuit found that these limitations rendered the post incident testing program there at issue a test on particularized suspicion. In the absence of such limitations, the Ninth Circuit found a similar program to be a test on generalized suspicion and a "major" dispute.

■ *c. Rule G enforcement by visual observation does not arguably justify mandatory random search with sniffer dogs.* Finally, in *Burlington III,* Burlington Northern instituted a program of random use of sniffer dogs to detect drug possession. The Ninth Circuit affirmed the District Court's finding that such testing based on no suspicion whatsoever constituted a new method of enforcing Rule G that was not "arguably justified" by past practice.

*Burlington I* also involved drug testing during physicals, as did *Norfolk and Western.* Here as well, testing during physicals was justified by reference to the past practice of urinalysis during physicals, rather than by reference to Rule G.

---

**21.** Southwest points to one case involving drug testing by an airline. *International Association of Machinists v. Trans World Airlines, Inc.,* 663 F.Supp. 230 (D.D.C.1987). This case is akin to *Burlington I* insofar as it involves only testing of individual employees based on reasonable suspicion.

*Burlington III* is fully consistent with *Burlington I.* The *Burlington I* court specifically said that the past practice justified tests based on particularized suspicion, but did not authorize a dragnet. ·Random use of sniffer dogs constitutes just such a dragnet.

■■ *d. Application to the present case.* From these three cases several principles emerge. *Burlington I* demonstrates that Rule G enforcement by visual observation coupled with a past history of voluntary testing justifies testing only on the basis of particularized suspicion, and that union acquiesence in voluntary use of urinalysis strengthens the argument that mandatory urinalysis is justified. *Burlington III* demonstrates that enforcement by visual observation does not justify testing on no suspicion whatsoever. *Burlington II* applied the self implied limitation on the reasoning in *Burlington I,* and reversed a district court finding that visual observation alone justifies testing on generalized suspicion. All of these cases support a conclusion that the dispute in this case is "major."

*i past practice of Rule G enforcement.* In the *Burlington* cases, there was universal acquiesence in visual observation followed by further investigation. Here the District Court was presented with only one isolated incident of Rule G enforcement and no evidence of enforcement policies or procedures. On review of the record the District Court's finding that there was no past practice is not erroneous.

*ii the scope of the program.* We then look at the Program and compare it to those at issue in the *Burlington* cases. The District Court correctly found that this program is far more extensive than the programs involved in the *Burlington* cases.

First, the Program provides for post accident testing of mechanics after a vehicular accident, unless management chooses to waive the test, because it has determined that there could not have been any drug involvement. Both *Burlington I* and *Bur-*lington II involved post incident testing only after human factor accidents. Southwest wishes to require testing after all vehicular or equipment damage accidents, human responsibility need not be implicated. The potential generality of this element of the program is striking when one considers that airline mechanics are not a part of any particular flight crew. With this in mind it is difficult to determine who would be tested and who could not be tested under the Program. Furthermore the Program does not include the self imposed limitations described in *Burlington I.* Instead testing is only waived if management determine that drugs were not a cause.

Second, the Program calls for mandatory tests of any "previously non-physicalled employee" who "successfully interviews for a position within the company which requires a physical examination." This, like the use of sniffer dogs in *Burlington III,* constitutes testing on the basis of no suspicion whatsoever.

Thus the Program proposed by Southwest includes all of the elements found to constitute "major" disputes by the Ninth Circuit in conjunction with a less extensive history of Rule G enforcement. Similarly, the Program is far broader in scope than that at issue in *Burlington I,* and the Teamsters have not acquiesced in voluntary use of urine screening. We are therefore inexorably driven to a conclusion that the Program constitutes a "major" dispute.

When the Program is taken as a whole, it includes a general drug and alcohol policy more stringent than Rule G itself, testing procedures not contemplated by the past practice under Rule G, and punishments unrelated to those described under Rule G. We agree with the District Court that the collective bargaining agreement provides no basis whatsoever for a mandatory drug testing program as broad and far reaching as that proposed by Southwest.

We also agree with the District Court that it was appropriate to treat the pro-

gram as a piece.[22] It was intended as a uniform comprehensive drug and alcohol use policy. Southwest, when requested to bargain, argued that they did not wish to bargain with individual unions over the Program, because they wished to apply a consistent policy to all bargaining units.

We are bolstered in our conclusion that Rule G does not provide even arguable justification for the Program by the statements of Rosemary Collyer, General Counsel of the NLRB, examining when contractual justification for a drug testing program should be inferred from past practice:

> A union's acquiesence in a past practice of requiring applicants and/or current employees to submit to physical examinations that did not include drug testing, or in a rule prohibiting the use or possession of drugs on company premises, does not constitute a waiver of the union's right to bargain over drug testing. This would be true even where such past practices exist in conjunction with the kind of general, nonspecific management rights clauses discussed above. Similarly, acquiesence in drug testing "for cause" does not by itself waive a union's right to bargain over random drug testing because such expansion of an existing drug program constitutes "a material, substantial, and significant change."

Collyer, *NLRB General Counsel's Memorandum on Drug and Alcohol Testing* (cited in note 12) (quoting *Murphy Diesel Co.*, 184 N.L.R.B. 757, 763 (1970)).

### III. Conclusion

The District Court correctly found that the union had not acquiesced in any method for detecting Rule G violations other than visual observation. Southwest presented no evidence of any past history of discipline for Rule G violations. The District Court properly concluded that the Program is far more extensive and far more intrusive than those at issue in either of the *Burlington* cases involving mandatory urinalysis. The

Program allows for testing in circumstances where there is only generalized suspicion and in circumstances where there is no suspicion whatsoever. The district court correctly concluded that implementation of the program creates a "major" dispute.

For these reasons, the order of the District Court is AFFIRMED.

---

**22.** The District Court also found that each of the individual elements of the plan constituted a "major" dispute. With respect to post incident testing and physical testing, we agree for the reasons stated above. The Program also in-cludes testing of individuals on reasonable suspicion and post accident testing where drug use was indicated. Given the scanty history of Rule G enforcement in this case, the District Court did not err.