**UNITED BROTHERHOOD OF CAR-
PENTERS AND JOINERS OF
AMERICA, LOCAL 2848, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 89–4212.

United States Court of Appeals,
Fifth Circuit.

Jan. 16, 1990.

L.N.D. Wells, Jr, Mullinax, Wells, Baab & Cloutman, Dallas, Tex., for petitioner.

Mark Gisler, Asst. U.S. Atty., Corinna Metcalf, Office of Gen. Counsel, Aileen Armstrong, Dept. Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., Michael Dunn, Director Reg. 16, Ft. Worth, Tex., for respondent.

Before RUBIN, REAVLEY and KING, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A labor union that had prevailed after an unfair labor practice charge had been filed against it by the National Labor Relations Board seeks an award of its fees and expenses pursuant to the Equal Access to Justice Act. We find that there is substantial evidence on the record as a whole to

support the NLRB's finding that its position in the underlying litigation was substantially justified, and deny the petition for review.

## I

In the fall of 1986, the Overhead Door Corporation sought to persuade its employees to switch from an existing pension plan (Plan 51), provided for in a collective bargaining agreement, to another (Plan 60). The union agreed to hold discussions, but disagreement soon arose over the appropriate amount of benefits to be paid to those employees already enrolled in Plan 51. In response, the union filed a grievance seeking a declaratory adjudication, under the existing collective bargaining agreement, of the proper calculation of benefits under Plan 51, but agreed to continue negotiating the proposed conversion to the new plan.

In a series of meetings held in November and December, the parties refined their positions and exchanged written proposals. At a meeting on December 30, 1986, the parties discussed the employer's four-item "final proposal." The four points were: (1) the amount of company contribution to Plan 60, (2) the amount to be distributed to current participants in Plan 51, (3) adoption of the company's position on the union's grievance, and (4) the all-inclusiveness of the company's proposal. The union initially rejected the proposal, continuing to insist on equivalence between employer contributions to Plans 51 and 60, but points (3) and (4) were discussed only in a cursory manner at the beginning of the meeting. After lengthy debate, the employer offered to increase certain elements of its contribution to the new plan, and the union then agreed to recommend the "proposal" or "figures" to its membership. The membership then voted to ratify this proposal.

Soon afterward, however, Shepard, the union's Chief Steward, was approached by employees who disapproved of the proposal. Dissident employees circulated and signed a petition urging rejection of the proposal. This led the union to declare that the ratification vote was void. At a final meeting between the parties, the union demanded arbitration regarding its interpretation of the benefits payable under Plan 51, while the employer stated that it considered the union bound by the ratification vote, and refused to arbitrate.

The employer subsequently filed a grievance with the NLRB, alleging that the union's refusal to execute a written contract incorporating an agreement between the two parties constituted a violation of its statutory duty to bargain collectively.[1] The General Counsel of the NLRB investigated, and subsequently issued a complaint. After a hearing, the ALJ found that there had been no meeting of the minds at the December 30th meeting regarding all the material elements of the proposed mid-term modification of the collective bargaining agreement, and dismissed the NLRB's complaint in its entirety. The parties subsequently negotiated a modification of the pension plan terms, stipulating to a dismissal of the union's grievance.

After its victory on the merits, the union filed for attorney's fees under the Equal Access to Justice Act (EAJA),[2] seeking to recover the fees and costs it had incurred in defending the union in the NLRB proceeding. The ALJ denied the fee application, finding that the NLRB was "substantially justified" in bringing suit since the case presented a close factual issue that turned in large part on the credibility of the various witnesses. The NLRB affirmed, finding that the General Counsel's decision to issue the unfair labor practice complaint was "reasonable in law and fact," in accord with the standard set out by the Supreme Court in *Pierce v. Underwood.*[3]

## II

The EAJA entitles a private party who prevails against a federal agency to recov-

---

1. *See* 29 U.S.C. § 158(b)(3); (d) (1988).

2. 5 U.S.C. § 504 (1988).

3. 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

er its fees and expenses "unless the adjudicative officer of the agency finds that the position of the agency was substantially justified...."[4]  *Underwood* defined the test for substantial justification to be whether the agency's position was reasonable in law and fact at the time the action was commenced.[5]

■ *Underwood* also held that the standard of review on appeal from a district court decision under the EAJA to be abuse of discretion.[6]  That case, however, involved appellate review of a district court determination of whether fees should be awarded, while this case comes to us for review directly from the administrative agency.  In reaching its conclusion, the *Underwood* Court noted that the standard of review was not specified in the statute, but concluded that considerations of appellate economy and practicality made the abuse-of-discretion standard appropriate.[7]  By their own terms, these reasons do not apply to the *initial* judicial review of agency fee determinations, even though made by an appellate court.

Extending *Underwood* to initial review of an administrative ruling by an article III court would contravene the statutory language, which provides that "the court [which would have jurisdiction to review the merits of the underlying decision] may modify the determination of fees and other expenses only if *the court* finds that the failure to make an award of fees ... was unsupported by substantial evidence."[8]  This indicates a Congressional intent that the substantial evidence standard, which is almost universal in reviewing agency determinations of all but legal questions, should apply to the initial judicial review of attorney fee awards under the EAJA.  Accordingly, we apply the substantial evidence test in this case.

**III**

■ The question, then, is whether there is substantial evidence on the record as a whole to support the inference that the union agreed at the December 30th meeting to waive its grievance if its members approved the new pension plan.

**A.**

The factual record of the crucial December 30th meeting is incomplete.  All parties agree that the meeting began with a discussion of the employer's four-point plan, which the union initially rejected.  In the subsequent bargaining, however, the company offered to increase the amount of its contribution to the new pension plan, and in response the union agreed to recommend "the proposal" or "the figures" to its members.  The union never explicitly assented to the employer's proposed withdrawal of the grievance, but neither did the company ever explicitly drop its condition that any comprehensive proposal include the union's agreement to drop its grievance.  In short, each side believed that the other had agreed to adopt the other's position regarding the union's grievance.

The ALJ presiding over the unfair labor practice hearing found that the employer's interpretation of the events at the meeting was reasonable, although the ALJ ultimately decided that in fact the parties had failed to agree on whether the union would abandon its grievance.  In adjudicating the union's fee petition, both the ALJ and the NLRB held that the resolution of the conflicting versions of what was agreed to turned largely on credibility.  Determinations of credibility are indeed generally left to the factfinder,[9] so the NLRB now contends that the General Counsel's decision to credit the employer's version of the meeting was itself reasonable.

In response, the union argues that the employer's version of the meeting was

---

**4.**  5 U.S.C. § 504(a)(1).

**5.**  108 S.Ct. at 2550.

**6.**  *Id.* at 2549.

**7.**  *See id.* at 2546–49.

**8.**  5 U.S.C. § 504(c)(2) (emphasis supplied).

**9.**  *See Natchez Coca–Cola Bottling Co. v. NLRB,* 750 F.2d 1350 (5th Cir.1985).

largely the product of wishful thinking, and that it was not reasonable for the General Counsel to credit it. Noting that the ALJ found the testimony of the company representative to be "rather disjointed and frequently conclusory," the union points to ambiguities in his testimony and notes that his pre-hearing affidavit did not indicate that the union had agreed to withdraw the pending grievance.

These ambiguities and lacunae in the employer's version of the meeting were a significant factor in the ALJ's decision to dismiss the General Counsel's complaint. But they are not dispositive of whether there is substantial evidence that the Board's interpretation of the facts was nevertheless reasonable. The ALJ found that the testimony of *both* the union's and the company's chief representatives were "disjointed and frequently conclusory," and that the union representative's version of the terms of the "proposal" was "somewhat confusing," because it conditioned acceptance of the proposal on the consent of the individual grievants to switch to the new plan.

Under these circumstances, the inability of the company representative to recall whether the union had specifically agreed to waive its grievance was not fatal to the reasonableness of the General Counsel's position, since there was substantial evidence from which a factfinder could have inferred that the parties had agreed to management's revised final proposal. The General Counsel interviewed the union representative and heard his version of the events before issuing her complaint, and decided to credit the management representative. Given the conflicting versions of the meeting, the situation raised exactly the kind of factual question that "justified the General Counsel's desire to see and hear live witnesses subjected to direct and cross-examination to make necessary credibility determinations." [10]

■ An agency cannot abdicate its responsibility independently to examine the likelihood of success of a proffered version of the facts by simply claiming that the ultimate decision turns on credibility, as this would bootstrap the agency's reasonableness to one party's subjective belief.[11] But that did not occur here. It was objectively reasonable to conclude that the employer had not dropped its condition, asserted throughout the course of negotiations, that any agreement on the new pension would include adopting the company's position on the grievance. When the union's negotiators agreed to recommend the revised contribution levels to the membership, it was objectively reasonable to conclude that the union impliedly considered these revised figures to meet its test of "substantial equivalence," which had been a prerequisite to dropping its grievance. Accordingly, we find that the General Counsel's position in issuing her complaint was reasonable in fact.

B.

The second element of the *Pierce v. Underwood* test is that the agency's position be reasonable in law. The union challenges the Board's conclusion in this regard, arguing that application of the correct legal standard to the events of the December 30th meeting would preclude finding any evidence sufficient to support the General Counsel's interpretation.

Counsel for the union argues that midterm modifications of existing collective bargaining agreements, like other waivers of statutorily protected rights under existing agreements, must be by "clear and unmistakable" evidence, citing *Metropolitan Edison Co. v. NLRB.*[12] The union argues therefore that the absence of a final integrated writing, coupled with the employer's conceded failure to recall any specific agreement by the union to waive its grievance, precludes as a matter of law the inference that the grievance was waived.

---

10. *Charter Management, Inc. v. NLRB,* 768 F.2d 1299, 1303 (11th Cir.1985).

11. *See Natchez Coca–Cola Bottling Co. v. NLRB,* 750 F.2d 1350, 1353–54 (5th Cir.1985).

12. 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387, 400 (1983).

The circumstances of the employee referendum offer some support to the union's position. It is undisputed that the union members were asked only to approve the terms of contribution to the new pension plan; no mention was made of the grievance. The union argues that the members could not have ratified a "package deal" that included a union agreement to waive the grievance if they were not notified that such a waiver was a condition of the employer's proposal.

■ In response, the NLRB asserts that the clear-and-unmistakable-waiver standard applies only to reopening the entire collective bargaining agreement, not modification of an individual term. Neither party is completely correct. *Metropolitan Edison* concerned a no-strike clause, but its language was specifically addressed to waiver of *any statutory* right.[13] The rule in the Fifth Circuit is that, "[i]n general, the contractual waiver of a statutory right under federal labor law must be clear and unmistakably expressed."[14] The union's willingness to discuss the employer's proposed Plan 60 did not subject the union to a statutory duty to bargain,[15] but it also did not waive the union's statutory right to enforcement of the terms of the existing Plan 51, via the grievance procedure.

The NLRB, on the other hand, is correct that the terms of the pension plan are a contractual matter, not a statutory right; but that is not in dispute. The issue is the standard of proof required to find a waiver of the grievance seeking interpretation of the existing plan. Section 8 of the National Labor Relations Act, which bars unilateral termination or modification of an existing agreement, does not distinguish between a waiver of statutory rights in the context of reopening an agreement and a modification of only one term,[16] and counsel for the Board advances no reason why we should create such a distinction here.[17]

The union's challenge to the NLRB's determination therefore must be resolved by finding whether there is substantial evidence on the record as a whole from which the General Counsel could infer a clear and unmistakable waiver. We hold that there was.

Reviewing the conflicting versions of the meeting, the ALJ engaged in a contract law analysis of whether there was a "meeting of the minds," finding such a meeting lacking. While we review the Board's determination, not the ALJ's, the Board adopted his interpretation in substance, with substantial record justification.

The union argues that the clear-and-unmistakable-waiver standard requires a greater degree of specificity than a mere contractual "meeting of the minds" to permit an inference of clear waiver. However, this implicitly takes the union's view of the facts, since it assumes that the grievance and the contribution levels were subjects to be negotiated separately. From the employer's view, the waiver of the grievance was an integral part of the negotiations over the contribution levels to the new plan, and had been on the table as part of the company's offer well before it was contained in the written four-point proposal that was the starting point for the December 30th meeting. Given these circumstances, the "history of prior contract negotiations" permitted the inference that the union's agreement to recommend Plan 60 to its membership constituted clear evidence of waiver of the grievance.[18]

**13.** *See* 460 U.S. at 708 & n. 12, 103 S.Ct. at 1477 & n. 12, 75 L.Ed.2d at 400 & n. 12.

**14.** *International Brotherhood of Teamsters v. Southwest Airlines,* 875 F.2d 1129, 1135 (5th Cir.1989) (en banc) (citing *Metropolitan Edison* ).

**15.** *Standard Fittings Co. v. NLRB,* 845 F.2d 1311, 1316 (5th Cir.1988).

**16.** *See* 29 U.S.C. § 158(d) (1982).

**17.** *Cf. NLRB v. Pennsylvania Tel. Guild,* 799 F.2d 84, 90 (3d Cir.1986); *NLRB v. General Tire and Rubber,* 795 F.2d 585, 588 (6th Cir.1986); *Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 676 F.2d 826, 832–33 (D.C.Cir.1982); *NLRB v. Northeast Oklahoma City Mfg. Co.,* 631 F.2d 669, 675 (10th Cir.1980).

**18.** *International Brotherhood of Teamsters v. Southwest Airlines,* 842 F.2d 794, 801 (5th Cir. 1988) (citing *NL Industries v. NLRB,* 536 F.2d 786 (8th Cir.1976)), *rev'd on other grounds,* 875 F.2d 1129 (1989) (en banc).

In sum, it is uncontested that the parties reached an agreement to present a proposal, of uncertain scope, to the union membership. The Board found that it was reasonable for the General Counsel to make the factual inference that this proposal included waiver of the grievance. We in turn hold that there was substantial evidence in the record to support the Board's finding; and, if the waiver of the grievance were part of the proposal, the acceptance of that proposal subject to ratification by the membership would satisfy the requirement of a clear waiver.

For the foregoing reasons, the petition for review of the decision of the National Labor Relations Board is DENIED.