RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Plaintiffs,

v.

PORT AUTHORITY TRANS–HUDSON CORP., Defendant.

RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Plaintiffs,

v.

METRO–NORTH COMMUTER RAILROAD CO., Defendant.

Nos. 86 Civ. 5308 (RLC), 86 Civ. 6066 (RLC).

United States District Court, S.D. New York.

Aug. 16, 1988.

Alper & Mann, Washington, D.C. (Lawrence M. Mann, of counsel), Peter M.J. Reilly, Islip, N.Y., for plaintiffs.

Patrick J. Falvey, New York City (Patrick J. Falvey, Sholem Friedman, James M. Begley, Kathleen M. Collins, of counsel), for defendant PATH.

Walter E. Zullig, Jr., New York City (Mary Ann Mills, of counsel), for defendant Metro–North.

## OPINION

ROBERT L. CARTER, District Judge:

In these cases, the Railway Labor Executives' Association and a number of the unions which make up its membership seek to enjoin certain employee drug-screening procedures which have been put in place unilaterally by the Port Authority Trans–Hudson Corporation ("PATH") and Metro–North Commuter Railroad Company ("Metro–North"). Plaintiffs assert entitlement to summary judgment on the basis of the Railway Labor Act, 45 U.S.C. §§ 151–188, the fourth amendment to the United States Constitution, and the doctrine of pre-emption. PATH, but not Metro–North, has cross-moved for summary judgment.

## BACKGROUND

### A. PATH

The parties to Number 86 Civ. 5308 have stipulated as follows: PATH, created in 1962 by the Port Authority of New York and New Jersey, operates an inter-urban railroad between the States of New York and New Jersey. Since 1962, all PATH employees have been governed by PATH's Book of Rules. Rule 15 provides in part that

[t]he use of intoxicants or narcotics by employees while on duty is prohibited. No employee shall present himself for or perform any service for PATH while under the influence of intoxicants or narcot-

ics. The possession of intoxicants or narcotics while on duty is prohibited. . . .

Rule 15 has customarily been enforced by supervisory observation and by requiring employees reasonably suspected of drug or alcohol abuse to undergo urine or other diagnostic tests. Rule 7 provides that an employee who commits an "insubordinate, dishonest, immoral, illegal or vicious act" may not remain in service.

The collective bargaining agreements into which PATH has entered with the unions representing its employees vest in PATH the discretion to conduct such medical examinations of its employees as it deems appropriate. PATH requires all of its hourly employees to undergo annual medical examinations. In addition, employees must undergo medical examinations upon returning to duty following an absence of ninety days or more due to furlough, leave, injuries, sickness, suspension or similar causes.[1] At both annual medical exams and return-to-duty exams, employees are required to provide a urine specimen.

In June, 1972, PATH began screening all urine specimens provided at annual medical exams for certain drugs, including various controlled substances. PATH did not post a general notice informing employees of such testing.[2] In 1979, the testing was expanded to include a marijuana screen. Specimens given at return-to-duty exams are screened for drugs only when the employee has been previously taken out of service for a drug-related problem or when, in the judgment of the examining physician, the employee may have been using drugs.[3]

The parties disagree as to the purpose of these drug tests. Plaintiffs contend that drug screening was instituted as a new method of enforcing Rule 15, while PATH asserts that its purpose was limited to de-

---

1. PATH's examining physician may require an employee absent due to sickness for less than ninety days to undergo a medical exam.

2. PATH contends that all employees were told of the testing requirement when they appeared for the examination. Plaintiffs state that many employees were not so advised.

3. The record does not reflect the date on which drug screening of employees upon return to duty commenced, or whether a general notice of the commencement of that practice was posted.

termining an employee's medical fitness. Both purposes apparently coexist at present, since PATH concedes that when an employee tests positive for drug use, PATH's medical personnel inform management both that the employee is (medically) unfit for duty and that "there has been an infraction of PATH rules." Doronin Aff't, ¶ 6.

In addition to conducting drug tests at the medical exams which it requires its employees to undergo, PATH has required various operating personnel covered by the Hours of Service Act, 45 U.S.C. §§ 61–66, to submit to post-accident testing under certain circumstances. This requirement was similar in scope to the testing subsequently mandated by a regulation of the Federal Railroad Administration ("FRA"). 45 C.F.R. Part 219 (1985). When the FRA regulation entered into effect on February 10, 1986, PATH conformed to it and posted a general notice to employees of the FRA testing requirements. On February 11, 1988, the Ninth Circuit struck down the FRA regulation on fourth amendment grounds. *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575 (9th Cir. 1988). The present record does not reflect whether PATH has discontinued its program of post-accident testing.[4]

The consequences for an employee of a positive drug test at a periodic or return-to-duty medical exam are not entirely clear. It is stipulated that "[i]n most instances no disciplinary action was taken" when an employee tested positive prior to 1985. Stip., ¶ 7; *see* Skowronski Aff't, ¶ 4. Before 1985, such an employee would be listed on medical records for future reference, and offered medical assistance. Subsequent to that time, however, when an employee's periodic or return-to-duty test shows positive, management is "advised that laboratory tests indicated that the employee is

unfit for duty and that there has been an infraction of PATH rules." Doronin Aff't, ¶ 6. It is not stated explicitly that disciplinary action is now taken, but the affidavit of PATH's medical administrator, *id.*, when read in conjunction with Rules 7 and 15, compels the conclusion that drug-positive employees are removed from service.

**B. Metro–North**

Number 86 Civ. 6066 has been submitted for decision on opposing affidavits. Defendant urges that disputed questions of fact preclude summary judgment. Since 1983, Metro–North has operated a commuter railroad between the States of New York and Connecticut. Metro–North's employees are bound to observe Rule G, similar in substance to PATH's Rule 15, which states in relevant part:

The use of intoxicants, narcotics, marijuana, amphetamines, hallucinogens or other controlled substances by employees subject to duty, or their possession or use while on duty, is prohibited and is sufficient cause for dismissal.

Plaintiffs contend that Metro–North originally relied on supervisory observation as its means of enforcing Rule G. Phelan Aff't, ¶ 4.

Like PATH, Metro–North performs periodic and return-to-duty medical examinations of its employees. Since 1983, urine and blood specimens have routinely been required at such exams. It is Metro–North's current practice to screen all employees' urine specimens for drugs, but the parties disagree on when that practice commenced. Metro–North contends that it has routinely engaged in such drug screening since early 1983. Herrlin Aff't, ¶ 4. Plaintiffs contend, however, that the present practice began in March of 1986. Statement Pursuant to Local Rule 3(g), at 2; Phelan Aff't, ¶ 9.[5] Employees who test

---

**4.** It is stipulated, however, that PATH employees not covered by the Hours of Service Act are not being subjected to post-accident testing.

**5.** Plaintiffs' Rule 3(g) Statement cites to paragraph 8 of the Phelan Affidavit in support of the claim that "Metro–North has, since at least May of 1983, required all hourly employees, both those covered by the [Hours of Service] Act and

those not covered by the Act, to undergo periodic physical examinations. Not until March 3, 1986, was a drug screen routinely included as part of the urinalysis or blood tests." Paragraph 8 of Phelan's Affidavit, however, omits the second sentence.

positive for drugs are subject to discipline and disqualification. Cairns Aff't, ¶ 6. Thus, Metro–North's screening program apparently serves a dual purpose just as PATH's does: to determine employees' medical fitness, *see id.,* ¶ 8, and to detect violations of Rule G. *Id.,* ¶ 6.

On February 15, 1986, shortly after the FRA's post-accident testing requirements went into effect, Metro–North established a written policy regarding substance abuse. Plaintiffs contend that Metro–North's practice of conducting routine employee drug tests originated with that written policy, which took effect on March 3, 1986. Metro–North contends, on the contrary, that its written substance-abuse policy simply "memorialized" its long-standing practice of conducting such tests. The policy makes provision for post-accident testing as required by the FRA regulation. There is no indication that such testing has been discontinued in response to the Ninth Circuit's decision in *Burnley,* 839 F.2d 575.

Plaintiffs state that they did not receive copies of the policy until they specifically requested them in June, 1986, while Metro–North contends that copies of the policy were "distributed ... to employees and their representatives" on March 3, 1986. In any event, nothing in the present record tends to show that plaintiffs were aware of the practice of routine drug testing prior to 1986.[6]

## DISCUSSION

### I. Railway Labor Act Claims

Plaintiffs assert that defendants have deviated from the requirements of the Railway Labor Act ("the Act") by unilaterally implementing their respective drug-testing programs. The Act does not prohibit drug testing by carriers, but simply requires them to negotiate with their employees prior to instituting any "major" change in working conditions. In response, defendants urge (1) that employee drug testing is

a matter within their managerial prerogative, (2) that plaintiffs have acquiesced in managements' respective drug-testing programs, and (3) that those programs raise only a "minor" dispute, over which the court lacks jurisdiction.

### A.

■ The Act imposes upon all carriers and their employees the duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions...." 45 U.S.C. § 152, First. If a dispute over a new management practice implicates a mandatory subject of bargaining under the Act, a carrier may not proceed unilaterally to institute that practice, but must negotiate over it with the employees' bargaining representative. *Int'l Brotherhood of Teamsters v. Southwest Airlines Co.,* 842 F.2d 794, 799 (5th Cir.1988). *See Order of Railroad Telegraphers v. Chicago & N.W. Ry.,* 362 U.S. 330, 339–40, 80 S.Ct. 761, 766–67, 4 L.Ed.2d 774 (1960). As to matters of managerial prerogative, on the other hand, that is, matters which do not concern "rates of pay, rules and working conditions" within the meaning of the Act, carriers are free to dispense with bargaining. *See Japan Air Lines Co. v. Int'l Ass'n of Machinists,* 538 F.2d 46, 51 (2d Cir.1976).

Under the "simple and pragmatic approach" pioneered by the *Japan Air Lines* court, the Act "requires parties to bargain over any proposal whose primary impact is the loss—or potential loss—of existing employment or employment-related benefits." *Brotherhood of Locomotive Engineers v. Burlington Northern R. Co.,* 838 F.2d 1087, 1090 (9th Cir.1988) ("BLE"). Since both PATH and Metro–North employ drug testing at least in part for the purpose of enforcing their disciplinary rules prohibiting drug use, rules the infraction of which can result in loss of employment, it is clear

---

**6.** Metro–North itself states that, prior to bringing this action, no union official had ever complained to it about its practice of administering routine drug tests at periodic and return-to-duty medical exams. Cairns Aff't, ¶¶ 5, 8; Herrlin

Aff't, ¶ 7. At best, the railroad's affidavits tend to show that the unions were aware that a policy of piecemeal or *ad hoc* drug testing was in place before 1986. Cairns Aff't, ¶ 6; Herrlin Aff't, ¶ 7.

that defendants' drug-testing programs are matters of mandatory bargaining under the Act. *See id.; Southwest Airlines,* 842 F.2d at 800–01.

## B.

Labor-management controversies subject to mandatory bargaining under the Act fall into two categories, which have come to be known as "major" and "minor" disputes. *Elgin, Joliet & Eastern Ry. Co. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). Federal subject-matter jurisdiction does not extend to the merits of minor disputes, *Int'l Ass'n of Machinists v. Aloha Airlines, Inc.,* 776 F.2d 812, 815 (9th Cir.1985); *Local 553, Transport Workers v. Eastern Air Lines, Inc.,* 695 F.2d 668, 675 (2d Cir.1982), which are resolved by compulsory arbitration before the National Railroad Adjustment Board. 45 U.S.C. § 153, First (i). Pending resolution of a minor dispute, the parties are under no duty to maintain the status quo. *BLE,* 838 F.2d at 1091. A party to a major dispute, on the other hand, may not introduce a disputed practice pending the exhaustion of the notice, negotiation and mediation procedures set forth in the Act. 45 U.S.C. § 156; *Air Cargo, Inc. v. Local Union 851,* 733 F.2d 241, 245 (2d Cir.1984); *Local 553,* 695 F.2d at 674. Either party to a major dispute may resort to the federal courts for an order enjoining the other's violation of the Act's status-quo requirement, *Local 553,* 695 F.2d at 674; *Railway Labor Executives Ass'n v. Consolidated Rail Corp.,* 845 F.2d 1187, 1190 (3d Cir. 1988) ("*Conrail*"), and such an injunction will issue without regard to the usual balancing of the equities. *Brotherhood of Maintenance of Way Employees v. Burlington No. R. Co.,* 802 F.2d 1016, 1021 (8th Cir.1986) ("*Maintenance Employees*").

■ Thus, the line between major and minor disputes, while "imprecise", *Local 553,* 695 F.2d at 673, is crucial. As a first approach, courts have looked "to the collective bargaining agreement to determine whether a plausible interpretation would justify the carrier's action." *Air Line Pi-*

*lots Ass'n v. Trans World Airlines, Inc.,* 713 F.2d 940, 948 (2d Cir.1983) (quoting *Local 553,* 695 F.2d at 673). Where the written agreement itself is silent on a particular matter, the court must take cognizance of contractual terms that are implied in the parties' relationship to one another. *Detroit & Toledo Shore Line R. Co. v. United Transportation Union,* 396 U.S. 142, 153–54, 90 S.Ct. 294, 301–02, 24 L.Ed. 2d 325 (1969) (agreement read in conjunction with practices which have "occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions"); *BLE,* 838 F.2d at 1092. "When long-standing practice ripens into an established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were part of the collective-bargaining agreement itself." *Maintenance Employees,* 802 F.2d at 1022.

Plaintiffs do not gainsay defendants' contractual right to conduct medical examinations of their employees for the purpose of evaluating their fitness for service, and to determine the content of those examinations. Nor do plaintiffs dispute that PATH's Rule 15 and Metro–North's Rule G (collectively, "Rule G"), and defendants' customary methods of enforcing these respective Rules, are implied contractual terms in which the unions have acquiesced. *See BLE,* 838 F.2d at 1092. All of these conditions constitute a part of the status quo in the relationship between the parties.

■ PATH contends that its employees have acquiesced in its fifteen-year-old program of testing urine specimens provided at annual examinations for drugs. Employees can acquiesce only in practices of which they have knowledge. *Detroit & Toledo Shore Line R.,* 396 U.S. at 153–54, 90 S.Ct. at 301–02; *see Conrail,* 845 F.2d at 1193, n. 3. PATH concedes, however, that it posted no general notice informing employees of its testing program, and the parties disagree as to whether many employees were informed of the practice in any manner whatsoever. The existence of this factual dispute precludes summary

judgment for PATH on grounds of acquiescence.[7]

## C.

■ Nonetheless, both PATH and Metro–North assert that the mere addition of a drug screen to the urinalyses they already performed with full contractual authority at annual and return-to-duty medical exams gives rise to only a minor dispute. Plaintiffs respond that drug screening is a new method by which the carriers enforce their disciplinary rules prohibiting drug use, rules the infraction of which may result in job termination; and that drug screening has expanded the scope of Rule G by bringing off-duty drug use into its purview for the first time.

■ The burden of showing that its "actions are at most minor changes, and thus within the status quo", falls upon a carrier who has introduced a disputed practice. *Maintenance Employees*, 802 F.2d at 1022. That burden is generally a light one: the carrier need only show that the agreement between the parties is "reasonably susceptible" of an interpretation which permits the practice at issue, *Local 553*, 695 F.2d at 673, or, put differently, that the agreement "arguably justifies" the practice. *Conrail*, 845 F.2d at 1190; *International Brotherhood of Teamsters v. Pan American World Airways*, 607 F.Supp. 609, 613 (E.D. N.Y.1985) (justification held "plausible", despite its "improbab[ility]"). A dispute is major, on the other hand, only if the contractual justification for the carrier's actions is "obviously insubstantial." *Local 553*, 695 F.2d at 673; *see Railway Labor Executives Ass'n v. Norfolk & Western*

*Ry.*, 833 F.2d 700, 705 (7th Cir.1987) ("*Norfolk & Western*") (in case of doubt, court will construe dispute as "minor"). The Second Circuit has cautioned, however, that these formulations are to be applied with circumspection; a management rights clause, for example, "which arguably can be enlisted to support any action taken by management that is not explicitly in conflict with a contractual right of the union," would not suffice of itself to render a dispute minor. *Local 553*, 695 F.2d at 673 n. 3; *see Southwest Airlines*, 842 F.2d at 804 (management rights clause "speaks only to [union's] willingness to abide by rules validly enacted").

The Courts of Appeals for the Third, Fifth, Seventh, Eighth and Ninth Circuits have recently considered the question of whether a carrier's implementation of employee drug-testing under circumstances similar to those at bar gives rise to a major or a minor dispute.[8] Three of those cases involved the introduction of drug screening as a part of routine medical examinations. In *Maintenance Employees*, 802 F.2d 1016, a divided panel of the Eighth Circuit held that drug screening of urine and blood samples taken at periodic medical examinations worked no "significant[ ] change[ ] [in] the ground rules" between carrier and union, where the carrier's right to require those medical exams was uncontested. *Id.* at 1024. The majority accepted the carrier's contention that drug screening was "nothing more than a method designed to detect the presence of a newly emerging threat to [employee] fitness" and "predict safe employee performance." *Id.* The district judge, on the other hand, had repeatedly characterized the dispute as one

---

7. PATH also argues that plaintiffs' action is barred by a six-month statute of limitations. The complaint was filed on July 7, 1986. Assuming for argument's sake that the six-month period applies here, PATH is not entitled to summary judgment on this ground. Resolving all factual doubts in favor of the nonmoving party, the inference is reasonable that plaintiffs were not aware of PATH's practice of universal drug testing until after February 10, 1986, the effective date of the FRA regulation. The statute of limitations did not begin to run until plaintiffs became aware of the disputed practice. *King v. New York Tel. Co.*, 785 F.2d 31, 34

(2d Cir.1986). *See West v. Conrail*, 481 U.S. 35, 107 S.Ct. 1538, 1540, 95 L.Ed.2d 32 (1987).

8. *Railway Labor Executives Ass'n v. Consolidated Rail Corp.*, 845 F.2d 1187 (3d Cir.1988) (major); *Int'l Brotherhood of Teamsters v. Southwest Airlines Co.*, 842 F.2d 794 (5th Cir.1988) (major); *Brotherhood of Locomotive Engineers v. Burlington Northern R. Co.*, 838 F.2d 1087 (9th Cir.1988) (major); *Railway Labor Executives Ass'n v. Norfolk & Western Ry.*, 833 F.2d 700 (7th Cir.1987) (minor); *Brotherhood of Maintenance of Way Employees v. Burlington No. R. Co.*, 802 F.2d 1016 (8th Cir.1986) (minor).

concerning "changes in detection methods for enforcing Rule G." *Brotherhood of Maintenance of Way Employees v. Burlington No. R. Co.*, 642 F.Supp. 41, 44, 45 (N.D.Iowa 1985), *aff'd in part & rev'd in part*, 802 F.2d 1016 (8th Cir.1986). In dissent, Judge Arnold implicitly accepted the trial court's characterization, and took the view that "universal and indiscriminate" testing "imposed without regard to any degree of suspicion that the employee is working while impaired" constitutes a "major departure from the established practice between employees and railroad." 802 F.2d at 1024, 1025 (Arnold, J., dissenting). That practice had been to enforce Rule G by sensory observation alone. *Id.* at 1018.

In *Norfolk & Western*, 833 F.2d 700, the Seventh Circuit held that the "addition of a drug screen as a second component of the urinalysis previously required of all employees does not constitute such a drastic change ... that it cannot arguably be justified by reference to the parties' agreement." *Id.* at 706. The district court's finding that the purpose of the drug testing was "to ensure that employees are fit for their jobs, not as a means of detecting Rule G violations" was not clear error, *id.* at 707, particularly since the consequences of a positive drug test differed "significantly" from those of a Rule G violation.[9] *Id.* at 707–08. For this reason, the court did not decide "whether the unilateral imposi-

tion of a drug screen urinalysis as a means of detecting Rule G violations would constitute a major or minor dispute." *Id.* at 708.

In *Conrail*, 845 F.2d 1187, the carrier rested its justification for drug testing exclusively on its existing medical policy, and denied that the testing was intended as a means to enforce Rule G. *Id.* at 1194. The Third Circuit held that the medical policy provided no arguable justification for the testing program. Like PATH and Metro–North, Conrail required periodic and return-to-duty medical exams of all employees. Drug screening was performed only under limited circumstances until 1987, when it became a universal feature of required medical exams. The court found that the new practice impermissibly expanded the scope of Rule G, which permitted discipline only of those employees "who are impaired while on the job or on call." *Id.* at 1193. Under the disputed practice, however, an employee who tested positive might "be fired even though s/he was never found to be impaired while at work or subject to duty." *Id.* The court found "particularly significant" the position of the General Counsel of the National Labor Relations Board that the addition of a drug screen to an existing medical examination program constitutes a substantial change in working conditions and is a mandatory subject of bargaining under the National Labor Relations Act.[10] Finally, the court

9. "An employee who violates Rule G is subject to immediate dismissal. An employee who tests positive for drug use, on the other hand, is given 45 days within which to demonstrate that his or her system is drug-free by providing a clean urine sample; or the employee can elect to participate in [a drug] treatment program." *Id.* at 708.

10. "In cases where an employer has an existing program of mandatory physical examinations for employees or applicants, an issue arises as to whether the addition of drug testing constitutes a substantial change in the employees' terms and conditions of employment. In general, we conclude that it does constitute such a change. When conjoined with discipline, up to and including discharge, for refusing to submit to the test or for testing positive, the addition of a drug test substantially changes the nature and fundamental purpose of the existing physical examination. Generally, a physical examination is designed to test physical fitness to per-

form the work. A drug test is designed to determine whether an employee or applicant *uses* drugs, irrespective of whether such usage interferes with ability to perform work. In addition, it is our view that a drug test is not simply a work rule—rather, it is a means of policing and enforcing compliance with a rule. There is a critical distinction between a rule against drug usage and the methodology used to determine whether the rule is being broken. Moreover, a drug test is intrinsically different from other means of enforcing legitimate work rules in the degree to which it may be found to intrude into the privacy of the employee being tested or raise questions of test procedures, confidentiality, laboratory integrity, etc. The implementation of such a test, therefore, is 'a material, substantial and ... significant change in [an employer's] rules and practices ... which vitally affect[s] employee tenure and conditions of employment generally.'" National Labor Relations Board, Office of the General Counsel Mem. GC 87–5 (Sept. 8, 1987), *reprinted in* Daily

noted that the carrier could not "point to any existing agreement between the parties on such crucial matters as the drug test to be used, the methods of confirming positive results, and the confidentiality protections to be employed." *Id.* at 1194.

In view of the fact that both PATH and Metro–North utilize their drug-testing programs at least in part as a means of detecting violations of Rule G, none of these cases is strictly on point. The court is persuaded by the position of the General Counsel of the N.L.R.B. that a "critical distinction" exists "between a rule against drug usage and the methodology used to determine whether the rule is being broken." National Labor Relations Board, Office of the General Counsel Mem. GC 87–5 (Sept. 8, 1987), *reprinted in* Daily Labor Report (BNA), No. 184 at D–2 (Sept. 24, 1987). PATH's former "methodology" called for drug testing of only those employees who were "reasonably suspected" of drug abuse; its present practice is to require such testing at annual examinations on no suspicion whatsoever. *See BLE*, 838 F.2d at 1092 (post-accident testing formerly voluntary, on particularized suspicion, presently mandatory, on generalized suspicion; change presented a major dispute). Thus, drug testing is not arguably justified by the past practice of sensory observation.

Nor is the testing arguably justified by Rule G. The Rule itself, as enacted by both PATH and Metro–North, prohibits the use or possession of intoxicants "while on duty." [11] Drug screening, however, effects a significant expansion in the scope of the Rule, in that it subjects to discipline those employees who test positive without regard to any proof of on-duty use or possession.[12] Finally, the court finds no arguable justification in the parties' agreements with respect to medical fitness examinations for a drug test which detects residues of off-duty drug use in employees who are not medically impaired on the job or while subject to duty.

For these reasons, each defendant's unilateral institution of periodic and return-to-duty drug-testing presents a major dispute and is enjoined.[13]

## II. Fourth Amendment and Preemption Claims

Plaintiffs claim that defendants' drug tests are performed without probable cause or reasonable suspicion, in violation of the fourth and fourteenth amendments. Metro–North admits that it is subject to the constitutional strictures on unreasonable searches and seizures, but asserts that drug testing of urine specimens freely provided at a routine medical examination does not constitute a search or seizure within the meaning of the fourth amendment. Both carriers defend on grounds of consent.

In view of its issuance of an injunction under the Railway Labor Act, the court does not find it necessary at this time to reach plaintiffs' constitutional claims. It is true that the injunction to which plaintiffs are entitled under the Act is limited in duration to the period during which they

Labor Report (BNA), No. 184 at D–1 (Sept. 24, 1987) (footnotes omitted).

11. Metro–North's Rule G also prohibits use by employees "subject to duty."

12. "[T]he state of the art drug tests currently used can discover only the metabolites of various drugs, which are not evidence of current intoxication and may remain in the body for days or weeks after the ingestion of the drug." *Burnley*, 839 F.2d at 589 (citing scientific literature).

13. Count One of plaintiffs' complaints in these actions apparently challenges as well the post-accident testing of employees not covered by the Hours of Service Act. PATH's motion for summary judgment is granted with respect to this

claim, inasmuch as it has been stipulated that non-covered employees have never been subjected to post-accident testing. Stip., ¶ 6. Additionally, plaintiffs' motion for summary judgment against Metro–North in respect of post-accident testing of non-covered employees is denied, since plaintiffs have come forward with neither evidence nor even bare allegations that non-covered employees have been subjected to such testing.

While the present record does not indicate that defendants have discontinued post-accident testing of covered employees in the wake of the Ninth Circuit's invalidation of the FRA regulation mandating such testing, plaintiffs' challenge does not extend to this practice.

are required to engage in bargaining with the carriers over the proposed changes in working conditions, whereas relief on fourth amendment grounds would forever enjoin the disputed testing. Nonetheless, in the event that the parties reach agreement on a mutually acceptable drug-testing program, the fourth amendment issue will be mooted by consent. Because plaintiffs have expressed a strong "desire to purge the industry of [the] adverse effects" of alcohol and drug use in employment, Plaintiffs' Br. at 1, the court is confident that the parties will engage in fruitful negotiations during the lifetime of the injunction. Should those negotiations deadlock and the injunction expire, plaintiffs are free to renew their constitutional claims.

Plaintiffs' claim based on federal preemption is without merit, and is dismissed.

## CONCLUSION

Defendants' periodic and return-to-duty drug testing presents a major dispute within the meaning of the Railway Labor Act and is enjoined pending exhaustion of the requirements of the Act. In all other respects plaintiffs' motions for summary judgment are denied, except that the court defers decision on plaintiffs' motions for relief premised upon the fourth amendment claims. Plaintiffs may renew those motions upon the expiration of the Railway Labor Act injunctions.

Defendant PATH's motion for summary judgment is denied in its entirety, except with regard to plaintiffs' deferred fourth amendment claim.

IT IS SO ORDERED.