**AMERICAN TRAIN DISPATCHERS ASSOCIATION, Plaintiff,**

v.

**METRO–NORTH COMMUTER RAILROAD COMPANY, Defendant.**

No. 88 Civ. 3839 (JMW).

United States District Court, S.D. New York.

Oct. 11, 1988.

Michael S. Wolly, Mulholland & Hickey, Washington, D.C., Paul G. Reilly, Jr., Reilly & Gatti, New York City, for plaintiff.

Mary Ann Mills, Associate Counsel, Metro–North Commuter R. Co., New York City, for defendant.

## OPINION

WALKER, District Judge:

Plaintiff American Train Dispatchers Association ("ATDA") charges defendant Metro–North Commuter Railroad Company ("Metro–North") with violating the Railway Labor Act ("RLA"), 45 U.S.C. § 152, Seventh and § 156, by promulgating various changes in work rules and conditions without prior consultation or bargaining with the union. These changes concern sick leave, vacation days, training time, work attire, and drug and alcohol testing. In its motion for preliminary and permanent injunctive relief, plaintiff seeks to restore the *status quo* which existed prior to changes made unilaterally by the defendant. Oral argument on the motion was held on June 22, 1988. For the reasons stated below, ATDA's motion for a preliminary and permanent injunction is granted in part and denied in part.

## FACTS

Metro–North employs 29 train dispatchers and 4 assistant chief train dispatchers for whom ATDA is the exclusive collective bargaining representative. A collective bargaining agreement ("Agreement") which governs hours of service, working conditions and rates of pay was entered into by ATDA and Metro–North. The Agreement became effective September 26, 1986, and by its terms it cannot be changed before January 1, 1989.[1]

---

1. The Agreement provides, in pertinent part, as follows:

### RULE 35
### NOTICE OF CHANGE

This Agreement shall become effective on the date of full and final ratification by the parties (September 26, 1986) and shall continue in full force and effect until changed or modified as provided herein or under the provisions of the Railway Labor Act, as amended, provided, however, that there shall be a moratorium on the service of Section 6 Notices until July 1, 1988, any changes not to become effective before January 1, 1989.

Should either party to this Agreement desire to revise or modify rules contained herein, thirty (30) calendar days' written advance notice containing the proposed changes shall be given and the first conference shall be held as soon as possible after thirty (30) calendar days from date of notice. Further conferences, if necessary, shall be held as promptly

Plaintiff contends that Metro–North, without conferring with the union in advance, adopted policies that resulted in changes to the Agreement or to practices which had become established working conditions. Plaintiff points to five areas of change and maintains that viewed collectively they constitute a "major dispute" under the RLA. Thus, plaintiff argues that Metro–North should be enjoined from enforcing its new policies. In response, defendant contends the changes are consistent with the terms of the Agreement and an appropriate exercise of management prerogatives; therefore, they constitute "minor disputes" under the RLA and referral to the National Railroad Adjustment Board is required.

*Sick Time*

Rule 23(i) of the Agreement states:

> Payment in cases of known bonafide disability should be made currently ... In cases of doubt, the train dispatcher will be required to prove in the form of a doctor's certificate that the sickness or injury is bonafide.

In the past Metro–North has rarely requested doctor's certificates from train dispatchers. On May 6, 1988, however, Metro–North adopted the policy that "anyone marking off sick will not be paid unless a Doctors [sic] note is presented."

Plaintiff contends that the requirement of a doctor's note in every instance is a radical departure from the Agreement and cannot be implemented without first exhausting certain procedures of the RLA. Defendant asserts that an internal review of sick time patterns conducted during the first half of 1988 uncovered a pattern of sick time being taken before and after rest days, holidays and vacation. This pattern, according to defendant, indicated that employees may be abusing their sick days. Consequently, management decided sick time should be more closely regulated by requiring a doctor's note prior to payment for sick time.

as possible and in accordance with the provisions of the Railway Labor Act, as amended.

*Training Time*

Rule 9(b) of the Agreement provides that each "successful applicant for a bulletined position will be given sufficient office and road time, with pay, to become familiar with the position ..." Plaintiff asserts that the carrier's announcement on May 6, 1988, that road time is suspended is a clear attempt to change the terms of the Agreement. Defendant, on the other hand, points to language in Rule 9(b) that states that road time is "to be determined by the Carrier." Defendant contends that its suspension of road time is based on "sound business judgment."

*Vacation Time*

On May 6, 1988, defendant informed members of ATDA that "[e]ffective immediately, no more single day vacations will be allowed. Any persons with scheduled single day vacation days must change the vacation calendar." Prior to the establishment of this policy, vacation time was taken by seniority without regard to the duration thereof.

Plaintiff objects to the prohibition against single vacation days asserting that members of the union have been able since at least 1981 to take single vacation days. Defendant counters by noting that the restriction adopted fits within the authority given to Metro–North by Rule 28(d) of the Agreement which states that "Carrier will schedule vacation periods consistent with the need of service."

*Attire in the Workplace*

The Agreement contains no dress code for train dispatchers. On April 26, 1988, management circulated a memo prohibiting the wearing of sneakers, jeans and t-shirts by train dispatchers. Plaintiff asserts that this action changed the status quo as reflected in existing working conditions. Defendant argues that this request was a proper exercise of management prerogative.

Pending final settlement of any dispute, these rules shall remain in full force and effect.

*Medical Exams*

After determining on or about May 6, 1988, that it allegedly lacked medical records for twelve train dispatchers, the defendant administered medical examinations that included testing for alcohol and drug use to those employees. The plaintiff contends that defendant's acts amounted to random drug testing. Although defendant disputes that the twelve employees tested were chosen with any malicious purpose and maintains that it has no program of random testing, defendant concedes that alcohol and drug testing is now part of the medical examinations it requires upon hiring, returning to work after a prolonged absence, and at established intervals over the term of employment.

Both in oral argument and in their papers, the parties informed this Court that Judge Carter of this district had before him precisely the same issue involving these parties in *Railway Labor Executives' Ass'n v. Metro–North Commuter R.R. Co.*, 86 Civ. 6066. On August 16, 1988, 695 F.Supp. 124, Judge Carter held that the imposition of such tests created a major dispute, and he enjoined further testing.

## DISCUSSION

This case concerns the categorization of the above disputes as either "major" or "minor" under the RLA. The significance of the classification is that its outcome largely determines the method by which the dispute is to be resolved under that act.

Although the RLA does not actually employ the terms "major" and "minor," the Supreme Court introduced and defined these concepts in *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). "Major" disputes are those which "relate to disputes over the formation of collective agreements or efforts to secure them." "Minor" disputes "contemplate the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." In *Local 553, Transport Workers Union v. Eastern Air Lines*, 695

F.2d 668, 673 (2d Cir.1982) (citations omitted), the Second Circuit, while noting that the major/minor distinction is an imprecise and difficult one for courts to make, articulated the difference as follows:

> Major disputes involved the formation or alteration of agreements ... Minor disputes in contrast ... turned on the application of an agreement's terms ... A dispute is major if the carrier's contractual justification for its actions is "obviously insubstantial." On the other hand, a dispute is minor if the contract is "reasonably susceptible" to the carrier's interpretation.

*Accord, International Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines*, 847 F.2d 1014, 1017 (1988); *Air Cargo, Inc. v. Local Union 851, International Brotherhood of Teamsters*, 733 F.2d 241, 245 (2d Cir.1984).

Notwithstanding these valiant efforts to formulate an approach to distinguish between the two types of disputes, courts still remain hard-pressed to resolve close cases. Indeed, there is a marked inclination to view disputes as minor, *Railway Labor Executives Ass'n v. Norfolk and Western Ry. Co.*, 833 F.2d 700, 705 (7th Cir.1987), yet the Second Circuit has cautioned against a perfunctory preference to view disputes in that manner. *Local 553*, 695 F.2d at 673 n. 3. Thus, each case requires a careful analysis of the facts and the collective bargaining agreement before a court should place the dispute in one category or the other.

The method of resolving railway labor disputes under the RLA is dependent upon the determination of whether the dispute is "major" or "minor." The RLA provides detailed and intentionally protracted procedures to facilitate the voluntary settlement of major disputes. First, the party must serve a notice requesting bargaining under Section 6 of the RLA. 45 U.S.C. § 156. The parties then attempt to resolve the dispute on their own, followed, at the request of either, by mediation by the National Mediation Board. 45 U.S.C. § 155, First. If mediation fails, the parties may, but are not required to, submit the dispute to bind-

ing arbitration. 45 U.S.C. § 155, First, § 157. If the parties do not consent to arbitration the President may then create an Emergency Board to assist in the resolution of the dispute. During this period, strikes or lockouts are prohibited. Indeed, "[w]hile the dispute is working its way through these stages, neither party may unilaterally alter the status quo." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). *Detroit & Toledo Shore Line R.R. Co. v. United Transportation Union*, 396 U.S. 142, 152–54, 90 S.Ct. 294, 300–01, 24 L.Ed.2d 325 (1969). Minor disputes, on the other hand, must be referred immediately to binding arbitration by an appropriate Adjustment Board. 45 U.S.C. § 153, First. Indeed, the resolution of such disputes is within the exclusive jurisdiction of the boards of adjustment. *International Ass'n of Machinists*, 847 F.2d at 1017.

At the outset, the Court must decide whether to view the defendant's acts collectively or individually. Plaintiff has provided little support for the argument that the carrier's acts should be considered as one dispute, and the Court is convinced that the proper way to view the facts of this case is to analyze each area of contention separately.

The core of the major/minor distinction is an analysis of whether the collective bargaining agreement or existing working conditions are reasonably susceptible of supporting the position adopted by either the carrier or the union. One outcome of this test is that a party to a collective bargaining agreement may unilaterally take positions which are plausibly supported by the agreement even though the status quo is altered. Simply because defendant has altered several of its policies within a narrow timeframe does not mean any or all of them are unsupported by the Agreement. Although plaintiff argues that defendant is engaged in a plot to ignore the dictates of the Agreement across the board and to weaken the ATDA, no evidence of such motives has been presented to this Court. While it is always advisa-

ble for the carrier to discuss its policy changes in advance with the union, the failure to do so, as in this case, does not inexorably lead to the conclusion that the railway is engaged in a plot to subvert the terms of the Agreement. Rather, the evidence suggests that the defendant is attempting to exercise greater control over certain aspects of its daily business. Such a goal is entirely permissible, provided that the means chosen are lawful.

Accordingly, the Court turns to an independent examination of each of the policies plaintiff has challenged. In performing this analysis, the Court is mindful that its function is not to determine the meaning of the Agreement but solely to assess whether it lends plausible support to the defendant's positions. *International Ass'n of Machinists*, 847 F.2d at 1017.

*Sick Leave*

 The defendant justifies its decision to require a doctor's certificate whenever a sick leave day is claimed by relying on the clause "[i]n cases of doubt" in the Agreement. While this clause certainly grants the defendant the power to require certification from a doctor whenever there is any doubt as to the bona fides of the reason for the day of missed work, the defendant has not come forward with evidence justifying its claim that there is *always* reason to doubt the integrity of the employee claiming a sick day. Rather, the defendant has evidence that sick days were apparently being abused by being taken in conjunction with rest days, holidays, and vacation days. In light of that evidence, the adoption of a policy automatically requiring certification when sick days were taken in conjunction with rest days, vacation days and/or holidays, but not otherwise, would be an action which a reasonable interpretation of the Agreement could justify. In this case, however, the Court concludes that defendant's contractual justification for its policy of always requiring certification is unsubstantial. Indeed, at the hearing on this motion, counsel for defendant could not justify the broad scope of defendant's poli-

cy.[2]

Accordingly, the Court determines that the automatic requirement for certification for sick days not contiguous to rest days, vacation days, or holidays presents a major dispute. The automatic requirement with respect to sick days that fall immediately before and after rest days, holidays, or vacation days creates a minor dispute.

### Training and Vacation Time

■ The provisions of the Agreement concerning training time (Rule 9(b)) and vacation time (Rule 28(d)) seemingly confer broad discretion on the carrier in establishing its policies in those areas. With respect to road days, the defendant argues that it has only suspended such training since it uncovered abusive practices. This position is arguably consistent with the Agreement since Rule 9(b) therein provides that road time is "to be determined by the Carrier ..." Accordingly, the court concludes that the disagreement over training constitutes a minor dispute.

The defendant has also suspended the taking of single vacation days because of a shortage in manpower.[3] Rule 29(d) empowers the defendant to "schedule vacation periods consistent with the need of service." Here, the defendant supports its policy by pointing to the shortage in manpower, that is, the need of service. While we agree with plaintiff that the carrier should have discussed this policy with union representatives before adopting it, a plausible argument has been made that the imposition of the change falls within defendant's contractual powers and, therefore, is a minor dispute.

### Work Attire

■ Although the Agreement does not create a dress code for union members, the Supreme Court has held that the status quo provisions of the RLA extend to "those actual, objective working conditions out of which the dispute arose" regardless of whether they are covered in the collective bargaining agreement. *Detroit & Toledo,*

396 U.S. at 153, 90 S.Ct. at 301; *Air Cargo,* 733 F.2d at 246. Thus, if the working conditions prior to defendant's adoption of its dress code were such that the dispatchers were allowed to wear jeans, t-shirts, and sneakers, the carrier's unilateral change of that status quo cannot be justified.

In this case, defendant does not even challenge the union's contention that the established practice was that its members remained free to dress as they pleased. Instead, the carrier asserts it has the absolute right to regulate the clothing worn by members of the union. This position, however, is without support. The Agreement is silent on this issue, and the only evidence before this Court is that union members have always been free to dress as they pleased. Given that established working condition, the defendant is precluded from unilaterally changing the status quo. Accordingly, the Court concludes that since the defendant's position is not justified by the working conditions in place before the issuance of its memo of April 26, 1988, it creates a major dispute.

### Drug Testing

■ Counsel for defendant has informed this Court that as a result of Judge Carter's injunction, drug and alcohol testing is not being performed as a part of routine medical examinations. Although plaintiff represented to the Court at oral argument that it believed defendant acted improperly in selecting the twelve employees for random testing, plaintiff has not presented any evidence to buttress its position. Further, an affidavit submitted to the Court by the general superintendent of transportation for Metro–North stated that those employees had missed their required examinations and thus were required to submit to new ones. In light of this evidence, as well as plaintiff's failure to submit any further evidence in support of its contention of random testing after requesting and receiv-

---

**2.** Transcript at 28 (Hereafter "Tr. at .").

**3.** Based on the manpower needs of defendant and the number of personnel available, Metro–

North established that it does face a shortage of manpower. Tr. at 31–33.

ing leave to do so by the Court,[4] plaintiff's request for injunctive relief to enjoin random alcohol and drug testing is denied. There is simply no evidence in the record that random tests are being conducted. With respect to alcohol and drug tests being performed as part of the regular medical examination process, there is no need for this Court to rule since that issue is currently being resolved under the major dispute resolution processes of the RLA pursuant to Judge Carter's ruling.

### Issuance of Injunction

Plaintiff has moved for both a preliminary and permanent injunction. The Court, on its own initiative, is empowered to consolidate the two motions with the result that the papers submitted and oral argument shall constitute the full trial on the merits. Fed.R.Civ.P. 65(a)(2).[5] In a case such as this, a court should refrain from ordering permanent injunctive relief if it is unable to decide upon the submissions before it whether the dispute is major or minor. Permanent relief, however, is appropriate when the Court has been able to classify the dispute as either major or minor. In the context of a RLA dispute, acts prompting a minor dispute are typically not enjoined, and a permanent injunction concerning a major dispute is only "permanent" in the sense that the parties are directed to pursue the procedures detailed in the RLA and precluded from altering the status quo ante. *Local 553*, 695 F.2d at 676 n. 6.

■ Based on the conclusions reached by this Court as detailed above, the issuance of a permanent injunction concerning the sick leave and work attire policies is appropriate. Accordingly, the Court need not address those issues peculiar to preliminary injunctive relief, such as irreparable harm. *Air Line Pilots Ass'n International v. Pan American World Airways, Inc.*, 600 F.Supp. 746, 750 (E.D.N.Y.), aff'd 765

F.2d 377 (2d Cir.1985); *Local 553*, 695 F.2d at 677; *Guinness–Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 471–72 (2d Cir.1980). Since in a railway labor case the permanent injunction is entered to preserve the statue quo ante, the usual balancing of the equities is not required. *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co.*, 802 F.2d 1016, 1021 (8th Cir. 1986).

Accordingly, the Court grants the plaintiff's motion for a permanent injunction concerning the work attire policy and that portion of the sick leave policy that automatically requires a doctor's certificate on days that are not contiguous to rest days, vacation days, or holidays.

■ Under certain circumstances, this Court also has the authority to issue injunctive relief when minor disputes exist. The Supreme Court has authorized federal courts to preserve the status quo pending resolution of a minor dispute where an injunction "rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas R.R. Co.*, 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960); *Local 553*, 695 F.2d at 675. Further, at least one court in this district has concluded that an injunction restoring the status quo in a minor dispute is warranted "if the equities of the situation so demand." *International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines*, 677 F.Supp. 173, 177 (S.D.N. Y.), aff'd 847 F.2d 1014 (1988).

The Court concludes that injunctive relief is not warranted concerning the minor disputes between these parties. Although Metro–North adopted a series of changes,

---

4. Tr. at 19–21.

5. Although it is within a court's discretion to consolidate the applications for preliminary and permanent injunctive relief, the court should ensure that the parties are on notice that the court may take this step. 7 Pt. 2 Moore's Feder-

al Practice ¶ 65.04[4]. In this case, plaintiff's papers indicated that it was moving simultaneously for both preliminary and permanent relief, and this position was repeated at oral argument. Tr. at 3.

all of which involved no consultation with the union, the Court is convinced that injunctive relief is not necessary to preserve the minor disputes for the Adjustment Board. The taking of road days and single vacation days as well as the elimination of the requirement of a doctor's certificate for sick days contiguous to rest days, holidays, and vacation days will still be possible if the arbitrator renders an award in favor of the union. Further, the equities in this case do not necessitate relief. While union members may justifiably be concerned about the carrier's actions, the defendant has convincingly argued that its position is based on safety concerns and the need to prevent abusive practices.

### CONCLUSION

Plaintiff's motion for permanent injunctive relief concerning sick days and work attire is hereby granted. All other requests for injunctive relief are denied. The parties are directed to submit a joint order to this Court within ten (10) days of the date hereof. If the parties cannot agree to an order, plaintiff is directed to submit an order within ten (10) days, and defendant shall have five (5) days to respond thereto.

SO ORDERED.